Case 1:06-cv-00099-S-LDA Document 1-2 Filed 03/03/2006 Page 1 of 4

** Exhibit 'A' **



failed to show reasonable diligence in attempting to discover the medical and other evidence that he now asserts was "newly discovered" for use at the original trial. *See State v. Bassett*, 447 A.2d 371, 375 (R.I.1982). Furthermore, the additional medical evidence concerning Mrs. Cronan's psychological condition appears to have been merely cumulative to the defense that was presented—one that concentrated upon and highlighted this evidence and endeavored to exploit all its adverse ramifications for Mrs. Cronan's credibility. Therefore, we remain unconvinced that it otherwise would have affected the outcome of the trial. *See, e.g., Mastracchio v. Moran*, 698 A.2d 706, 714 (R.I.1997); *State v. Mastracchio*, 605 A.2d 489, 494 (R.I.1992).

## Conclusion

For these reasons, we affirm the conviction below and deny the defendant's appeal.

Chief Justice WILLIAMS and Justice GOLDBERG did not participate.

STATE

v.

Jacques GAUTIER.

Nos. 2000–213–M.P., 99–270–C.A.

Supreme Court of Rhode Island.

June 29, 2001.

In probation-revocation proceedings, the Superior Court, Providence County, Rodgers, C.J., and Needham, J., entered finding of non-violation. State petitioned for certiorari. The Supreme Court, Williams, C.J., held that: (1) it was not trial justice's role to make determination as to whether defendant was responsible for murder; (2) defendant could have been found to be probation violater either for lacking in requisite good behavior expected and required by his probationary status, or for fleeing from police officer; and (3) state is precluded from relitigating defendant's guilt or innocence for criminal offense after finding of non-violation at probation-revocation hearing.

Judgment quashed, papers remanded.

**1. Criminal Law ⟹1024(1)**

Absent a constitutional or statutory provision the state has no right to an appeal in a criminal proceeding.

**2. Criminal Law ⟹1024(1)**

The state can seek and obtain appellate review in a criminal matter by petitioning the Supreme Court for a writ of certiorari where it appeared that an inferior court had improperly taken jurisdiction or had clearly abused its proper jurisdiction.

**3. Criminal Law ⟹1134(7)**

The Supreme Court limits its review on certiorari to examining the record to determine if an error of law has been committed.

**4. Criminal Law ⟹1134(7)**

On certiorari review, the Supreme Court does not weigh the evidence presented below, but rather inspects the record to determine if any legally competent evidence exists therein to support the findings made by the trial justice.



**5. Sentencing and Punishment ⟹2002**

The appropriate role of the hearing justice in a probation-revocation hearing is to determine only whether in the hearing justice's discretion the defendant's conduct on the day in question had been lacking in the required good behavior expected and required by his probationary status.

**6. Sentencing and Punishment ⟹2002**

It is not the role of the hearing justice in a probation-revocation hearing to determine the validity of the specific charge that formed the basis of the violation.

**7. Sentencing and Punishment ⟹2002**

A showing that the defendant has failed to keep the peace and to remain on good behavior is sufficient to establish a probation violation. Superior Court Rules Crim.Proc., Rule 32(f).

**8. Sentencing and Punishment ⟹2010**

The state has virtually unfettered discretion in determining when to proceed against a defendant as a probation violator and upon what grounds. Superior Court Rules Crim.Proc., Rule 32(f).

**9. Sentencing and Punishment ⟹2006**

It was not trial justice's role in probation-revocation hearing to make determination as to whether defendant was responsible for murder; rather, it was sufficient that murder had occurred and that defendant was present when it occurred. Superior Court Rules Crim. Proc., Rule 32(f).

**10. Sentencing and Punishment ⟹2002, 2004**

Defendant could have been found to be probation violater either for lacking in requisite good behavior expected and required by his probationary status, or for fleeing from police officer; evidence showed that defendant was present during brutal slaying, that he had failed to notify police after he fled scene, and that he fled from lawful stop by police officer.

**11. Judgment ⟹751**

The state is precluded from relitigating a defendant's guilt or innocence for a criminal offense after a finding of non-violation at a probation-revocation hearing.

---

Aaron Weisman, Ronald R. Gendron, Providence, for Plaintiff.

Paula Rosin, Paula Hardiman, David A. Levy, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

WILLIAMS, Chief Justice.

This case came before us pursuant to a petition for certiorari filed by the State of Rhode Island (state), requesting review of the judgment of a Superior Court justice, finding that the defendant, Jacques Gautier (defendant), had not violated his probation. The state urges this Court to review the trial justice's findings and conclusions of law and to conclude that the decision of the trial justice was clearly erroneous. The facts insofar as pertinent to this appeal are as follows.

On July 21, 1998, defendant entered pleas of *nolo contendere* to charges of delivery of cocaine and conspiracy to deliver cocaine. He was sentenced on each count to ten years at the Adult Correctional Institutions, twenty-one days to serve, with the remainder of the term suspended with probation. Three months later, on October 6, 1998, the Providence police arrested defendant on a charge that he had murdered his wife's boyfriend, Jeffrey In-

Case 1:06-cv-00099-S-LDA Document 1-2 Filed 03/03/2006 Page 2 of 4



dellicati (Indellicati).[1] The next day, defendant was presented as an alleged violator of the terms and conditions of his probation.

A violation hearing was held on November 12 and 20, 1998, before a Superior Court trial justice. Five witnesses testified at that hearing. The state presented three of those witnesses—defendant's wife, Minerva Gautier (Minerva), Providence Police Officer Anthony Teixeira, Jr., and Chief Medical Examiner Dr. Elizabeth Laposata. Minerva testified that on October 2, 1998, while she was still married to defendant, she moved into an apartment at 30 Barbara Street with Indellicati and Eros (Eros), her twenty-two-month-old son by defendant. Minerva testified that during the early morning hours of October 6, 1998, she was awakened by noises in the kitchen. When she got up to investigate, she discovered defendant in the kitchen; he apparently had entered the apartment through the kitchen window. Minerva testified that defendant told her that he loved her, asked her how she could allow Indellicati to take care of their son, and told her that he (defendant) had been following her all day. Minerva testified that defendant also stated that Indellicati "was stealing his family." She began arguing with defendant; Indellicati woke up and came into the kitchen wearing only his boxer shorts. Thereafter, Minerva testified, a fight ensued between Indellicati and defendant, at which point, defendant grabbed a large knife from one of the kitchen drawers and began stabbing Indellicati. Minerva testified that she became concerned about Eros, went into his room to check on him, and then returned and tried to break up the fight by stepping between Indellicati and defendant. She was unsuccessful. The defendant then chased Indellicati into the bathroom, where Indellicati slipped on water on the floor. Minerva testified that defendant continued to stab Indellicati as he lay helplessly on the floor. She then attempted to administer CPR to Indellicati, but defendant, holding a knife to her throat, told her to get Eros and to drive them all to his sister's apartment at 53 Lancashire Street, where defendant recently had been staying. Minerva testified that when they arrived at the Lancashire Street apartment, defendant told his sister that he had killed Indellicati.

Officer Anthony Teixeira, Jr. (Officer Teixeira), a patrol officer with the Providence Police Department, testified next. He testified that, on October 6, 1998, he received information from his sergeant at roll call that a murder had taken place at 30 Barbara Street and that a beige Honda with tinted windows, a cracked windshield, and Florida license plates had been seen in the area. Officer Teixeira recognized the description of the vehicle. The prior week, he had followed Minerva, who had been driving a vehicle fitting that description, to the Lancashire Street apartment after she had made a domestic complaint against defendant. Accordingly, Officer Teixeira proceeded to 53 Lancashire Street on the morning of October 6, 1998. As he was driving down Lancashire Street, Officer Teixeira saw the vehicle pull into the driveway. He pulled up behind the vehicle and twice ordered the operator to get out of the vehicle. The operator, however, put the vehicle in reverse, backed up a few feet, then drove off through the side yards and over the curbing down the street. Officer Teixeira gave chase, and, with the assistance of another police cruiser that had come to the scene, apprehended the driver about a block away. At that point, he discovered that defendant was the operator of the vehicle. Officer Teixeira testified that when he apprehended defendant, defendant had blood on his clothing and that there was blood on the interior of the vehicle. Officer Teixeira also testified that there was a fresh cut on the palm of defendant's hand.

The state's third witness was Chief Medical Examiner Dr. Elizabeth Laposata (Dr. Laposata). Doctor Laposata testified that she did an autopsy on Indellicati on October 7, 1998. She testified that Indellicati had sixty-eight separate wounds. Half those wounds were incise wounds (wounds made by a sharp object in which the wound on the skin surface is longer than the depth of the wound into the body), and the other half of the wounds were stab wounds (wounds made by a sharp object in which the wound into the body is deeper than the length of the wound on the skin surface). She testified further that Indellicati had received two different types of stab wounds: one caused by a large knife and another caused by a smaller knife. She testified that at least one of the knives was serrated. Doctor Laposata also testified that the two knives that were seized from the scene were consistent with Indellicati's wounds.

The defense presented two witnesses at the hearing. The first witness, defendant's sister, Brandy Jimenez (Jimenez), testified that she was awakened during the early morning hours of October 6, 1998, by defendant and Minerva, who both told her that Indellicati had been stabbed and that she should call an ambulance. Jimenez testified that she overheard defendant say to Minerva, "I'm going to get blamed for this," and that Minerva had responded, "I'll tell them I did it." The defendant's second witness was fourteen-year-old Herminio Asencio (Asencio). Asencio testified that in early October he had helped defendant move furniture from the apartment that defendant and Minerva had been living in before moving to 30 Barbara Street. Asencio testified that he did not help defendant move the furniture into the new apartment, but that he had heard defendant say that "he would do [the move the] * * * next day with [Minerva] so she can fix [up] everything [in the apartment]." The defense then attempted to introduce a copy of the lease for the new apartment. The defense sought to introduce a copy of the lease for credibility purposes and in an attempt to prove that defendant had a right to be in the apartment and to help the court determine, if the trial justice found that Indellicati had been the initial aggressor, whether defendant had a duty to retreat.

At the conclusion of the hearing, the trial justice determined that, based on the Super.R.Crim.P. 32(f) notice that the state had presented alleging only the offense of murder, defendant was not a violator. The trial justice stated,

> "I made a factual finding [that] I did not believe the State's witness that [defendant] in fact caused the death or that he murdered—and that was the notice that was given to the defendant—that he murdered [Indellicati]. * * * I'm called upon to make certain findings. The evidence presented to me, as I indicated to you in chambers, I think the 32(f) notice was deficient. Had the 32(f), for example, alerted the defendant to the fact that he was being accused of violating the nine-and-a-half years I believe it was, nine years, ten months of a previously suspended sentence because he beat up his wife or violated a restraining order, that would have been simple. But the 32(f) notice presented to me said that he's a violator because he murdered [Indellicati]. From the evidence presented to me, I was not satisfied the

1. Throughout the record, Indellicati's first name is spelled "Geoffrey." However, the briefs and transcripts refer to Indellicati as "Jeffrey."

Case 1:06-cv-00099-S-LDA Document 1-2 Filed 03/03/2006 Page 3 of 4



State met its burden [in proving] that he did murder [Indellicati]."

Specifically, the trial justice did not find Minerva to be a credible witness. The trial justice noted inconsistencies between Minerva's in-court testimony and her statements to the police after the incident. The trial justice also noted that there were inconsistencies between her testimony on direct examination and her testimony on cross-examination, and found her testimony "to be somewhat inherently improbable[,]" especially in light of her demeanor in the courtroom. Specifically, Minerva "displayed absolutely zero emotion from [the] witness stand * * *." The trial justice stated, "it's my sense she is hiding something. She wasn't completely truthful." However, the trial justice did not find that defendant was not present or in any way not involved with this homicide.

The state appealed the trial justice's finding. However, because this Court decided in *State v. Beaulieu*, 112 R.I. 724, 315 A.2d 434 (1974), that double jeopardy considerations prohibit the state from filing an appeal from an adjudication of nonviolation, the state filed the instant petition for the writ of certiorari. The state argues that the trial justice's determination of nonviolation was clearly erroneous. Furthermore, the state argues that if the trial justice's decision was allowed to stand, defendant would evade prosecution altogether, pursuant to this Court's decision in *State v. Chase*, 588 A.2d 120 (R.I. 1991). Before addressing the state's argument that the trial justice erred in determining that defendant did not violate the terms of his probation, we will address the propriety of the instant writ.

[1-4] "It is well settled in this jurisdiction that absent a constitutional or statutory provision the state has no right to an appeal in a criminal proceeding." *Beaulieu*, 112 R.I. at 726, 315 A.2d at 435. However, "the state [can] seek and obtain appellate review in a criminal matter by petitioning this [C]ourt for a writ of certiorari where it appeared that an inferior court had improperly taken jurisdiction or had clearly abused its proper jurisdiction." *Id.* at 726-27, 315 A.2d at 435. "This Court limits its review on certiorari 'to examining the record to determine if an error of law has been committed.' *City of Providence v. S & J 351, Inc.*, 693 A.2d 665, 667 (R.I.1997) (per curiam). 'We do not weigh the evidence presented below, but rather inspect the record to determine if any legally competent evidence exists therein to support the findings made by the trial justice.' *Id.* (citing *Matter of Falstaff Brewing Corp. Re: Narragansett Brewery Fire*, 637 A.2d 1047, 1049 (R.I. 1994))." *Gregson v. Packings & Insulations Corp.*, 708 A.2d 533, 535 (R.I.1998).

[5-8] Although we agree that the Rule 32(f) notice presented by the state in the instant case was insufficient,[2] we grant the state's petition for certiorari. At the outset, the trial justice misconceived his role at the probation-revocation hearing. It is well settled in this state that "the appropriate role of the hearing justice [in a probation-revocation hearing is] to determine 'only whether in [the hearing justice's] discretion [the defendant's] conduct on the day in question had been lacking in the required good behavior expected and required by his probationary status.'" *State v. Znosko*, 755 A.2d 832, 834-35 (R.I. 2000) (quoting *State v. Godette*, 751 A.2d 742, 745 (R.I.2000)). It is not the role of the hearing justice to determine the validity of the specific charge that formed the basis of the violation. *See id.* at 834; *see also Godette*, 751 A.2d at 745; *State v. Hie*, 688 A.2d 283, 284 (R.I.1996); *State v. Pinney*, 672 A.2d 870, 871 (R.I.1996). Rather, "pursuant to Rule 32(f), a showing that the defendant has failed to keep the peace and to remain on good behavior is sufficient to establish a probation violation." *Znosko*, 755 A.2d at 835 (citing *Godette*, 751 A.2d at 745).

[9] In the instant case, the trial justice concluded that he was not satisfied that the state had met its burden in proving that defendant had murdered Indellicati. The trial justice noted, "[t]he question remains, am I satisfied from the credible evidence presented that there's a fair likelihood that it was this defendant [who was] responsible for that killing? I would be in violation of my oath if I said I was satisfied." However, it was not the trial justice's role to make that determination. Rather, the evidence presented was more than sufficient to establish that a murder had occurred and that defendant was present when it occurred. Indeed, the trial justice noted that Indellicati had been murdered and that only three people knew what had happened: defendant, Minerva, and Indellicati. The fact that defendant was present during such a brutal slaying and that he had failed to notify the police after he fled the scene was enough to establish that his conduct on the day in question "had been lacking in the required good behavior expected and required by his probationary status." *Godette*, 751 A.2d at 745.[3]

[10] Furthermore, pursuant to the state's Rule 32(f) notice, defendant could have been found a probation violator on either of two grounds: first, for "lacking in the [requisite] good behavior expected and required by his probationary status" in connection with the murder of Indellicati, and second, for fleeing from a police officer. The evidence in the record was sufficient to show that defendant, a probationer, fled from a lawful stop by a police officer. Officer Teixeira testified that defendant fled after twice being ordered out of his vehicle. He also testified that after he pulled up behind defendant's vehicle, defendant put the vehicle in reverse, backed up a few feet, and drove off through the side yards and over curbing down the street. Finally, Officer Teixeira testified that he pursued the vehicle and, with the help of another cruiser, apprehended the operator about a block away. That testimony was uncontradicted. Accordingly, defendant could have been found a probation violator on those grounds.

[11] Finally, the trial justice made an error of law when he stated at the conclusion of the probation-revocation hearing that a jury would be able to decide the defendant's guilt or innocence at a subsequent trial on the merits. The trial justice stated: "I'll let that decision be made by

2. In the instant case, the record indicates that the state possessed evidence that defendant had a restraining order against him as a result of an alleged assault on his wife and that he had violated that restraining order. The state, which has virtually unlettered discretion in determining when to proceed against a defendant as a probation violator and upon what grounds, could have proceeded against the defendant upon those grounds. *See LaChappelle v. State*, 686 A.2d 924, 927 (R.I. 1996). On remand, the state may amend its Super.R.Crim.P. 32(f) notice to include that charge, and may introduce additional evidence as needed to support that charge.

3. In the instant case, the trial justice based his decision on the fact that he did not find Minerva to be a credible witness. Indeed, it is well settled that "[w]eighing evidence and assessing the credibility of witnesses are the functions of the trial court." *State v. Kennedy*, 702 A.2d 28, 33 (R.I.1997) (quoting *State v. Studman*, 121 R.I. 766, 770, 402 A.2d 1185, 1187 (1979)). However, even discounting Minerva's testimony, the evidence in the record is sufficient to support a finding that defendant had violated the terms of his probation.

the factfinder of the jury." He also stated: "I made a factual finding [that] I did not believe * * * that he murdered [Indellicati]. How that impacts on the ability to go forward, that's a legal matter that counsel will have to wrestle with." Unfortunately and unintentionally, the trial justice misconceived the consequences of an adjudication of non-violation. Our holding in *Chase* precludes the state from relitigating a defendant's guilt or innocence for a criminal offense after a finding of non-violation at a probation-revocation hearing. *See Chase*, 588 A.2d at 121–22.[4]

For the foregoing reasons, the state's petition for certiorari is granted. The judgment of the Superior Court is quashed and the papers of the case are remanded to the Superior Court with our decision endorsed thereon for redetermination in light of our holding in *Znosko*.

## In the Matter of William R. MacLEAN.

No. 2001–216 M.P.

Supreme Court of Rhode Island.

June 29, 2001.

In an attorney disciplinary proceeding, the Supreme Court Disciplinary Board recommended public censure. The Supreme Court held that suspension of attorney until he could prove he was capable of resuming practice of law and attending to his duties in representing clients was appropriate for attorney who failed to act with reasonable diligence, failed to keep client reasonably informed, commingled monetary judgment with attorney's business account, and failed to respond to four additional pending petitions for disciplinary action.

Attorney suspended.



**1. Attorney and Client ⚷58**

Suspension of attorney until he could prove he was capable of resuming practice of law and attending to his duties in representing clients was appropriate for attorney who, when representing landlord in action to recover damages for tenant's destruction of property, failed to act with reasonable diligence, failed to keep landlord reasonably informed, and commingled monetary judgment with attorney's business account, who failed to respond to four additional pending petitions for disciplinary action, and who failed to maintain appropriate contact with health care provider treating him for depression and panic disorder. Sup.Ct.Rules, Art. V, Rules of Prof.Conduct, Rules 1.3, 1.4(b), 1.15(a, b, c), 8.1(b).

**2. Attorney and Client ⚷49**

The purposes of professional discipline are to protect the public and to maintain the integrity of the profession.

---

David Curtin, pro se, For Plaintiff.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

### OPINION

PER CURIAM.

This disciplinary case came before the Court pursuant to a recommendation of the Supreme Court Disciplinary Board (board) that the respondent, William R. MacLean (respondent), be disciplined. Article III, Rule 6(d) of the Supreme Court Rules of Disciplinary Procedure provides in pertinent part: .

"If the Board determines that a proceeding * * * should be concluded by public censure, suspension or disbarment, it shall submit its findings and recommendations, together with the entire record, to this Court. This Court shall review the record and enter an appropriate order."

This matter came before the Court at its conference on May 23, 2001. The respondent had been ordered to appear to show cause, if any, why the disciplinary sanction recommended by the board should not be imposed. Having heard the recommendations of respondent and of Disciplinary Counsel (counsel), and having reviewed the record, we deem it appropriate that a disciplinary sanction be imposed. However, for the reasons set forth below we decline the recommendation of a public censure and instead suspend respondent from the practice of law until further order of this Court.

The relevant facts of this matter, as found by the board, are as follows. In February 1998, Gilbert C. Brunhoeffer III (Brunhoeffer), acting on behalf of Poste Restaurante, Inc., retained respondent to file suit against a former tenant for damages caused to a rental property. The respondent was directed by Brunhoeffer to file the claim immediately. The respondent did not promptly file the claim, and failed to respond to repeated requests from Brunhoeffer regarding the status of the case.

The respondent eventually did file suit in the District Court, and the case was assigned a trial date of June 15, 1998. Brunhoeffer was advised of the scheduled trial date, and made arrangements to travel from Ohio to Rhode Island to be present for the hearing. The trial date was subsequently changed to June 29, 1998, at the request of respondent. However, respondent did not notify Brunhoeffer of the changed trial date, resulting in Brunhoef-

4. In *State v. Chase*, 588 A.2d 120, 121 (R.I. 1991), the defendant, while on probation for a previous conviction, was arrested after allegedly selling cocaine to an undercover police officer. At the conclusion of the probation-revocation hearing, the trial justice denied the motion to find defendant in violation of his probation. *See id.* The trial justice noted that the defendant had only been out of jail for less than a month, that the defendant recognized one of the individuals involved as a police officer, and that he had been aware that the officer was acting in an undercover capacity. *See id.* The trial justice, therefore, "found it incredible that defendant would have breached the terms of his probation by committing the alleged offenses." *Id.*

Thereafter, the defendant moved to have the charges against him dismissed on the grounds of collateral estoppel, double jeopardy, and due process. *See id.* The trial justice denied that motion. We reversed. We held that "a finding of nonviolation at a probation-revocation hearing precludes the state from relitigating the issue of defendant's guilt or innocence for the criminal offense." *Id.* at 121–22. We based our decision on the principle of collateral estoppel. We held that a "specific finding on a material matter of fact fully litigated at the probation-revocation hearing will collaterally estop the state from attempting to prove the same fact at trial." *Id.* at 123.

Our decision in *Chase* is distinguishable from the instant case. In *Chase*, the trial justice found that the defendant was not guilty of doing anything. In the instant case, the trial justice was unable to make such a determination. The trial justice in the instant case noted that a murder had occurred, but that it should be left to the jury to determine who had committed that murder.

It has been suggested that we reconsider our decision in *Chase* in light of recent cases that clarify the role of a hearing justice at a probation violation hearing. *See State v. Znosko*, 755 A.2d 832 (R.I.2000); *State v. Godette*, 751 A.2d 742 (R.I.2000). That issue, however, is not currently before us. We decline to reconsider our ruling in *Chase* until the parties have been given an opportunity to fully brief that issue.